UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GREGORY WRIGHT,

                                    Plaintiff

                                                            DECISION AND ORDER

-vs-

                                                            10-CV-6502 CJS

JAMES ESGROW,

                                    Defendant

_____

        This is an action pursuant to 42 U.S.C. § 1983, in which Plaintiff, a prison inmate in

the custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), alleges that Defendant, who is a hearing officer employed by DOCCS, violated

his federal  constitutional due process rights during a disciplinary hearing.  Now  pending

before the Court is Defendant's motion (Docket No. [#8]) to dismiss and/or for summary

judgment.  The application for summary judgment is granted.

BACKGROUND

        Unless otherwise noted, the following are the undisputed facts of this case.  At

all relevant times Plaintiff was confined at Elmira Correctional Facility.  On or about July

3, 2008, Corrections Sergeant Krause ("Krause") issued Plaintiff a misbehavior report,

accusing him, along with two other inmates, of assaulting another inmate and "forc[ing]

[him] to engage in [a] sexual act."  The misbehavior report alleged that the attack had

taken place approximately[1] one month earlier, "in early June at approximately 2:30 pm

in the Mess Hall #2 inmate bathroom."  Plaintiff and the other two accused inmates

_____

        [1]According to Krause, the "victim" claimed that he waited approximately three weeks
before reporting the incident.

worked in the facility kitchen that was near the aforementioned bathroom.  The kitchen was supervised by Corrections Officer Knuth ("Knuth").  However, the kitchen was separated from the bathroom area by a door that was usually, if not always, locked and controlled by Corrections Officer Otto ("Otto").  The misbehavior report did not specifically describe the nature of the alleged sexual assault.  The misbehavior report also did not state that a weapon was used during the attack, though the alleged victim later claimed that his attackers used a weapon to subdue him.

Upon being accused of the infraction, Plaintiff was immediately placed in the Special Housing Unit ("SHU") pending a hearing.  Plaintiff was assigned a hearing assistant, who gathered whatever evidence Plaintiff requested to the extent that it was available.  In that regard, Plaintiff asked to have the videotape of the area where the attack allegedly took place, but prison officials indicated that the tape was not preserved.

The disciplinary hearing was held between July 8, 2008 and August 14, 2008.[2] Defendant James Esgrow was the hearing officer.  The Court will refer to the victim as "X."  X was an inmate who worked in Mess Hall 2, near the kitchen.  Plaintiff's theory of defense was that the attack never happened, and that X had fabricated the entire event, because he wanted a transfer to another facility.  Plaintiff claimed that X had made similar false allegations at Attica Correctional Facility ("Attica").  Plaintiff further maintained that the attack could not have occurred as X claimed for the following reasons: 1) Plaintiff would have been busy working in the kitchen under Knuth's

---

[2]The Court has reviewed the transcript of the tier disciplinary hearing, including the portion that was provided to Plaintiff, and the portion that was provided to the Court for in camera review.

supervision at 2:30 p.m.; 2) kitchen workers were not allowed in Mess Hall 2, and if the event had occurred as X claimed, Otto would have seen it; and 3) X was "keeplocked" in his cell for a disciplinary infraction at the time of the alleged attack.

At the start of the hearing, Plaintiff provided Defendant with a list of witnesses that he wanted to testify.  Plaintiff asked to call Krause, Knuth and Otto.  Defendant indicated that he would question Knuth and Otto outside of Plaintiff's presence, but that Plaintiff could provide him with certain questions to ask Knuth and Otto, which Plaintiff did.  Plaintiff also requested testimony from his two "co-defendants," Michael Bethea ("Bethea") and Anthony Green ("Green"), as well as two other inmates, Keith Edwards ("Edwards") and Brandon Holmes ("Holmes").  Plaintiff also asked Defendant to explore X's mental health history and possible motivation for fabricating the allegation, since X had a history of mental illness and of fabricating such allegations to obtain transfers.  Defendant told Plaintiff that he would confidentially review X's records.  Plaintiff told Defendant that he understood that certain parts of the testimony from witnesses would be confidential, and that he would not be allowed to hear such testimony.  Plaintiff's witness list did not include two civilian witnesses who worked in the kitchen.

At the hearing, in Plaintiff's presence Krause testified that he had attempted to review videotape from the security cameras, but it was not preserved.  Plaintiff attempted to ask Krause questions about the nature and extent of his investigation, but Defendant did not allow the questions, since he intended to question witnesses with firsthand knowledge about those matters.

Defendant took additional testimony from numerous witnesses outside of Plaintiff's presence.  The first confidential witness was a corrections officer who

interviewed X.  The officer stated that X told him that the three inmates had anally raped him and then made him perform oral sex on all three of them.  Subsequently, though, X testified that he was anally raped by only two, and only forced to perform oral sex on one of them.  The corrections officer further testified that it was his understanding that the accused inmates, who worked in the kitchen, had "free access" to the mess hall where the assault allegedly occurred.  The officer further indicated that the door between the kitchen and mess hall was usually unlocked, and that it would be "very easy" for kitchen workers to have committed the attack.  The officer also stated that he had heard from inmates that the three accused inmates were "high ranking gang members."  The officer further stated that he had talked with unidentified inmates who worked in the kitchen, and they said that they had heard that someone had recently been raped in the mess hall bathroom.

Defendant also took confidential testimony from a Corrections Captain who had interviewed X about the alleged attack.  The Captain indicated that X was unsure of the exact date of the attack.  The Captain stated that X seemed genuinely fearful when being interviewed, and that facility medical records indicated that X had experienced some type of anal penetration.  On that point, though, there is no indication that any objective exam was performed.  Instead, it appears that X merely made a subjective complaint of having anal problems.  Nevertheless, the Captain stated that he found X to be credible.  Curiously, though, the Captain described X as being a "very small

vulnerable white inmate," with a "slight" build,[3] while the aforementioned corrections officer described X as follows:

> [X] is about 5' 8", stocky build, he's not somebody that's ripped and in shape but he looks like a typical farmboy type. . . . He doesn't look like your typical guy that is taken advantage of sexually. He's not a 135 lb scar[ed] looking kid, he's just a normal, average guy.

The Captain admitted that he was not aware of any evidence to either support or deny X's accusation, and that it was a matter of X's word against the word of the three accused inmates.

Defendant also took confidential testimony from a psychologist at Elmira, who interviewed X following the alleged assault. The psychologist stated that X seemed more nervous than usual following the date of the alleged assault, and claimed to be suicidal, which resulted in him being transferred to a mental health unit.

Defendant next took confidential testimony from a corrections officer who was working in the kitchen on June 4, 2008. The officer testified that he was right in the kitchen and could see all of the inmates working there. The officer further stated that the kitchen inmates had their own bathroom and would not use the mess hall bathroom. The officer opined that the three accused inmates could not have committed the attack in the mess hall bathroom:

> Q. Based on you recollection, can you tell me that these guys could not have left their post and gotten into that bathroom?

---

[3]The Captain's complete statement on that point was as follows: "What I determined by [X's] physical appearance was that he is a very small vulnerable um white inmate and these three alleged attackers were good sized folks and over six foot, black males very aggressive, had violent histories. So, the puzzle has been put together."

A. I can't say 100% on that, but I would say no they didn't.

In that regard, the officer stated, for example, that Plaintiff worked on the ovens, and that he generally never left his work area for any reason, and that if he had done so, it would have appeared strange, and he would have remembered it.  The officer stated that it would have been even more unusual and remarkable if all three of the accused inmates had been missing from the kitchen at the same time, and he did not recall that happening.  The officer also stated that 2:30 p.m. would have been a very busy time in the kitchen, preparing for the evening meal.

Defendant also took confidential testimony from X.  X stated that the three inmates had "jumped" him at the  mop sink in Mess Hall 3 and dragged him to the bathroom in Mess Hall 2, and that there had been no corrections officer watching the area.  As noted earlier, X further stated that he was anally raped by two of the three inmates and forced to perform oral sex on the third, contrary to what a corrections officer indicated X had previously told him.  X also stated that following the alleged attack, he attempted to tell Corrections Officer Knuth about it, but Knuth seemed not to care.  X stated that he then got into an argument with Knuth, which resulted in him being keeplocked after Knuth issued him a misbehavior report.  X stated that the inmates who attacked him indicated that they were doing so because X has the same surname as one of the corrections officers at Elmira.

Defendant next took confidential testimony from a social worker at Great Meadow Correctional Facility ("Great Meadow"), where X was transferred after leaving the mental health unit.  The social worker stated that while testifying  about the alleged

incident, X seemed nervous and agitated.  The social worker stated that X had only arrived at Great Meadow the previous day, but that his initial behavior could be consistent with post traumatic stress disorder. The social worker stated that X claimed to have a history of suicidal ideation and cutting himself.  After observing X for a few days, though, the social worker gave additional testimony, in which she opined that X's behavior was "not congruent to somebody who has been brutally raped."  The social worker stated that X told her that in addition to being held with a weapon to his throat, he was punched, which he had not previously claimed.  The social worker further noted, after reviewing X's chart, that he had a history of "making dramatic complaints that eventually were found not to be true."  The social worker stated that X was manipulative, and she questioned whether he actually was suffering from post traumatic stress disorder.

Defendant next took confidential testimony from a corrections officer who was working in Mess Hall 2 on June 4, 2008 at 2:30 p.m.  The officer stated that kitchen workers "wouldn't be allowed in [the] mess hall," because they did not work there.  The officer stated that typically there were only four or five inmates working in the mess hall, including X. The officer stated that it was "very unlikely" that the attack happened as X claimed, since the doors between the kitchen and mess hall were always locked, except for when they were unlocked by a corrections officer.  The officer stated that on June 4, 2008, he issued a misbehavior report to X, at which time he did not notice anything unusual about X's behavior.  The officer stated that X probably fabricated the accusation against the three inmates in order to "get back at [him] for writing [the] misbehavior report" against X.  On that point, the officer testified:

Q. Well why do you say that?

A. Well cause he's mad cause I locked him up.

Q. Ok alright, uhm anything else you have for me?

A. I just can't see these three guys you know there's no way you are gonna get four guys in that bathroom, without one of [us] knowing something's going on and that many people in there, you'd definitely see it.

Consequently, the officer concluded that X was lying.

In addition to the preceding confidential testimony, Defendant took testimony from inmate witnesses outside of Plaintiff's presence, and then played the tape back for Plaintiff to listen to. Green testified that he and Plaintiff did not commit the attack, and that they could not have done so because they are always working in the kitchen at 2:30 p.m. Inmate Brandon Holmes ("Holmes") testified that his cell was near X's, and that while X was keeplocked in his cell, supposedly after the alleged attack occurred, X was laughing and joking with other inmates, and showing no signs of having been through a traumatic event. Inmate Keith Edwards ("Edwards") testified that he worked in the kitchen with Plaintiff, and that Plaintiff would have been working at 2:30 p.m. in the kitchen. Edwards stated that Plaintiff ordinarily would not finish preparing meal trays until 3:00 p.m. or 3:30 p.m. on any given day. Inmate Michael Bethea ("Bethea"), though, testified that the kitchen workers usually finished assembling food trays between 2:15 p.m. and 3:00 p.m.

Defendant also took testimony from Plaintiff, who adamantly denied doing anything to X. Plaintiff further stated that he could not have attacked X at 2:30 p.m.,

8

since he was always busy assembling food trays in the kitchen, in view of Officer Otto, until at least 3:10 p.m. each day.  Plaintiff further stated that inmates could not enter Mess Hall 2 from the kitchen unless Knuth allowed them in.

On August 14, 2008, Defendant completed the hearing and found Plaintiff guilty, and sentenced him to two years in SHU.  Defendant stated that some of the evidence was exculpatory, but that some of the confidential evidence was credible and explained a possible motive for the alleged attack:

> I find that some of the credible confidential testimony is exculpatory in nature; however, other confidential testimony contains details and specifics, does not appear to be motivated by a desire to harm you, and does appear to provide a motive for you actions.  I find the incriminating evidence to be credible.

With regard to evidence of motive, Defendant apparently was referring to X's claim that he was attacked because he had the same last name as a corrections officer.  In denying Plaintiff's request to know the substance of the confidential testimony, Defendant stated, in pertinent part: "It's something that I don't think can be disclosed to you without endangering security at this facility, and that's why I did it confidential." In explaining the reason for his two-year SHU sentence, Defendant explained that the sentence was based in part on the fact that a weapon was allegedly used in the assault. However, prior to sentencing, Plaintiff had no notice that a weapon was allegedly used. Plaintiff subsequently spent almost two years in SHU before his conviction was administratively reversed.

On September 2, 2010, Plaintiff commenced this action, proceeding *pro se*. Liberally construed, the Complaint [#1] purports to state a Fourteenth Amendment

Procedural Due Process claim, based on the following: 1) Defendant denied Plaintiff the opportunity to call two civilian kitchen employees as witnesses; and 2) Defendant improperly failed to allow Plaintiff to know the substance of that portion of Knuth's and Otto's confidential testimony that did not implicate security concerns.

Shortly after Plaintiff commenced this action, the Court granted Plaintiff's request proceed *in forma pauperis*, and directed the U.S. Marshal to serve Defendant. However, service on Defendant was delayed for over a year, apparently because Plaintiff mistakenly indicated that Defendant was located in Albany, New York. On November 23, 2011, Defendant appeared in the action.

On December 14, 2011, Defendant filed the subject motion [#8] to dismiss and/or for summary judgment. The Notice of Motion [#8] indicates that Plaintiff is moving to dismiss the Complaint pursuant to FRCP 12(b)(6). Defendant's Memo of Law [#9], though, does not discuss Rule 12(b)(6), but instead, argues that Defendant is entitled to summary judgment under FRCP 56. Defendant's motion includes various documents related to the disciplinary proceeding, including the non-confidential portions of the hearing transcript. Defendant also submitted the transcript of the confidential testimony *in camera*. Defendant raises two arguments in support of his motion: First, that Plaintiff's contention that he was not permitted to call the civilian cooks as witnesses lacks merit, since he never made such a request; and second, Plaintiff's claim that he should have been told the substance of Knuth's and Otto's testimony lacks merit, since there were valid security reasons for not doing so. Plaintiff opposes the motion, and has also submitted matters outside of the pleadings, including an affidavit with exhibits.

DISCUSSION

At the outset, since both parties have submitted matters outside the pleadings, it is appropriate to "convert" Defendant's nominal motion to dismiss into a motion for summary judgment pursuant to FRCP 12(d). *See, Mathie v. Dennison,* No. 06 Civ. 3184(GEL), 2007 WL 2351072 at * 10 (S.D.N.Y. Aug. 16, 2007) ("Plaintiff submitted over 1300 pages of exhibits with his response, ranging from the minutes of his parole hearings to various statistical reports regarding New York's allegedly unconstitutional parole policy. In addition, defendants submitted several exhibits in support of their motion. Thus, both parties have been afforded the opportunity to present supporting material, and therefore defendants' motion to dismiss may be properly treated as one for summary judgment.") (citation and internal quotation marks omitted).

Defendant, though, did not serve an *Irby* notice on the *pro se* Plaintiff. *See, Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001) (Warning that the Circuit Court will "vacate summary judgment dismissals against a *pro se* litigant when the *pro se* is unaware of the consequences of failing to adequately respond to the motion for summary judgment"). Since the docket sheet indicated that the motion was pursuant to Rule 12(b)(6), the Court did not become aware of this discrepancy until it began preparing this Decision and Order, long after the briefing schedule was completed. Consequently, it did not independently provide Plaintiff with an *Irby* notice. *See, id.* at 414 ("In the absence of such [*Irby* notice by the moving party], the district court should promptly provide the *pro se* with such required notice."). However, the absence of an *Irby* notice need not necessarily result in the vacatur of a grant of summary judgment where the *pro se* litigant had a "clear understanding" of the consequences of failing to

comply with Rule 56. *See, Id.* ("[A] district court need not advise a *pro se* litigant as to the nature of summary judgment where an opposing party has already provided the litigant with the requisite notice … *or where the record otherwise makes clear that the litigant understood the nature and consequences of summary judgment*.") (emphasis added, citation omitted). Here, it appears from Plaintiff's responsive papers, including a detailed affidavit [#13-1] with exhibits, that he understood that Defendant's motion was for summary judgment. *See*, Pl. Memo of Law [#1] at pp. 3-4 (acknowledging that Defendant is seeking summary judgment). Moreover, the instant motion involves legal issues, not factual ones, and it does not appear that Plaintiff is in any way prejudiced by the lack of a formal *Irby* notice. That is, Plaintiff's legal arguments are well-presented and must be liberally construed, and it does not appear that he would have done anything differently if he had been served with an *Irby* notice.

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).

The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no

reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).   Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Plaintiff is suing pursuant to 42 U.S.C. § 1983, alleging that Defendant violated his federal constitutional rights while acting under color of state law.   In that regard, it is clear that where prison inmates have a liberty interest in avoiding disciplinary confinement[4], they are entitled to procedural due process protections:

> Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

*Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted).   To comport with due process, a disciplinary ruling must be supported by "some evidence." *Id*. at 487-488 (citation omitted).   "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." *Id*. at 488 (emphasis added, citation omitted).   The Second Circuit interprets this statement to require "'reliable evidence' of the inmate's guilt." *Id*.

### Denial of Request to Call Two Civilian Cooks To Testify

Plaintiff alleges that he "testified that he would like to call both civilian cooks as

---

[4] "A prisoner's liberty interest is implicated when an institution's disciplinary decision results in an 'atypical and significant hardship … in relation to the ordinary incidents of prison life.'" *Luna v. Pico*, 356 F.3d 481, 487 n.3 (2d Cir. 2004) (*quoting Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

witnesses," but Defendant denied his request. Complaint [#1] ¶ 18.   In the Complaint, Plaintiff specifically identified the two civilian witnesses as "Mr.Roy" and "Mr. Scott." *Id*. Due process requires that an inmate "has a restricted right to call witnesses" at a disciplinary hearing, though a hearing officer may "refuse to call witnesses whose testimony may be reasonably regarded as duplicative or non probative." *Feliciano v. Selsky*, 199 F.3d 1322 (table), 1999 WL 1012652 at *1 (2d Cir. Oct. 20, 1999) (citations and internal quotation marks omitted).   Plaintiff's claim on this point lacks merit, since he never asked to have the two civilian witnesses testify.   The Court has carefully reviewed the hearing transcript, and Plaintiff never made such a request.   At most, Plaintiff alluded to the fact that civilian witnesses worked in the kitchen. However, it is clear that Plaintiff was counting on the testimony of corrections staff to establish that he was in the kitchen at the time of the alleged assault, and such testimony supported that contention.   Accordingly, Defendant is entitled to summary judgment on that aspect of Plaintiff's claim.

### *Testimony Outside of Plaintiff's Presence*

Plaintiff does not object generally to the fact that certain evidence against him was kept confidential.   Instead, he contends that the testimony of Knuth and Otto, concerning security in the kitchen and mess hall and Plaintiff's access to the mess hall bathroom, as well as the Knuth's testimony concerning X's demeanor, should have been disclosed to him.   Or more accurately, he contends that at least the substance of such testimony should have been shared with him.   In that regard, he contends that Defendant failed to offer "valid security reasons" for keeping such testimony confidential.

14

At the outset, to the extent that Plaintiff may believe that Defendant did not actually take testimony from Knuth and Otto, that is incorrect. Moreover, as discussed above, some corrections staff testified favorably to Plaintiff. More specifically, some corrections staff doubted that the attack could have occurred as X claimed, and one officer opined that X was lying in order to get him into trouble. Defendant therefore accurately stated that some of the confidential evidence was "exculpatory in nature."

With regard to Plaintiff's claim that he was entitled to know the substance of the corrections officers' confidential testimony, it is clear that

> [a]n inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings. *Wolff*, 418 U.S. at 567-68; *Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir.1999); Silva v. Casey, 992 F.2d 20, 22 (2d Cir.1993). Thus, "[p]rison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding." *Francis v. Coughlin*, 891 F.2d 43, 48 (2d Cir.1989); *Bogle v. Murphy*, No. 98-CV-6473 CJS, 2003 WL 22384792 (W.D.N.Y. Sep.9, 2003) (plaintiff's ejection from his disciplinary hearing was not a due process violation).

*Hidalgo v. Hopin*, No. 01-CV-0057(Sr), 2009 WL 4803689 at *12-13 (W.D.N.Y. Dec. 9, 2009) (footnote omitted). Moreover, "institutional safety concerns may provide a sufficient reason for prison officials to decline to inform an inmate of . . . evidence." *Francis v. Coughlin*, 891 F.2d at 47. Additionally, "[a] hearing officer is not required to disclose a confidential informant's testimony to an accused inmate in a disciplinary hearing." *Edmonson v. Coughlin*, 21 F.Supp.2d 242, 252 (W.D.N.Y. 1998) (citing *Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir.1996)).

Here, the confidential testimony by corrections staff working in the kitchen and

15

mess hall concerned security matters, insofar as it primarily involved what they could see from their posts, when they took breaks, and how they kept track of the inmates working in their individual work areas.  Defendant probably could have informed Plaintiff of the gist of such testimony  in a manner that would not have revealed any security information, which is all that Plaintiff wanted.  Nevertheless, his failure to do so did not violate Plaintiff's federal due process rights.

### *Notice of the Charges Against Him*

Plaintiff's Complaint is primarily concerned with Defendant's alleged wrongful failure to notify Plaintiff of the substance of confidential testimony, and his alleged failure to allow Plaintiff to call the two civilian cooks to testify. *See*, Complaint [#1] ("By failing to disclose the substance of the alleged confidential information, characterizing non-confidential information as confidential, and by failing to call the two civilian witnesses, Hearing Officer James Esgrow deprived me of my constitutional right to call witnesses, [and] my constitutional right to due process of the law[.]").  However, the Complaint can also be liberally construed as raising an additional claim of insufficient notice of the charges against Plaintiff.   On this point, Plaintiff contends that the misbehavior report failed to mention that a weapon was allegedly used.  Defendant accepted X's testimony that a weapon was used, and found such use of a weapon to be an "aggravating circumstance" when formulating a sentence, though he did not indicate specifically how such aggravating factor affected the sentence.  Defendant apparently did not read the Complaint [#1] in that light, since his motion does not address this "notice" claim. Nevertheless, to the extent that Plaintiff is claiming that the failure to notify him about the alleged weapon resulted in a violation of his federal due process rights, the Court

16

disagrees.

With regard to the type of notice that is required prior to a prison disciplinary hearing, it is well settled that,

> "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing." *Sira* [*v. Morton*], 380 F.3d [57,] 70 [(2d Cir. 2004)] (citing *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974)). Such notice is not an "empty formality," particularly when, as in this case, "large parts of the disciplinary hearing are conducted outside the inmate's presence." *Id.*; *see also Taylor* [*v. Rodriguez*], 238 F.3d [188,] 192-93 [(2d Cir. 2001)]. To satisfy due process, the notice must contain "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.* at 72 (citing *Wolff*, 418 U.S. at 564). Where possible, the notice should include information about the date, place, and manner of the alleged misconduct. When that information is unavailable, the notice should explain that that information is unknown. *Id.*

*Johnson v. Greiner*, No. 03 Civ. 5276(DLC), 2007 WL 2844905 at * 13 (S.D.N.Y. Sep. 28, 2007). However, "the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct; [rather,] there must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Johnson v. Goord*, 487 F.Supp.2d 377, 394 (S.D.N.Y. 2007) (citation and internal quotation marks omitted), *aff'd*, 305 Fed.Appx. 815 (2d Cir. Jan. 9, 2009).

In this case, Plaintiff does not dispute that he was notified of the alleged date, time and location of the alleged infraction, as well as the name of the victim and his

alleged "co-defendants."   He was also generally notified that the infraction involved a sexual assault against the male inmate.   Plaintiff was not notified beforehand that the alleged assault involved the use of a weapon.   However, it does not appear that fact affected Plaintiff's defense, since his defense was that the attack never occurred because he and his co-defendants did not have access to the bathroom where the attack allegedly occurred, and that X fabricated the incident.   Consequently, Plaintiff denied every single aspect of the alleged attack.   In effect, Plaintiff's defense was that, *regardless* of what X may have said about the attack, none of it was true, because it couldn't have occurred as he claimed.   Accordingly, the failure to notify Plaintiff of one aspect of the alleged assault, i.e, the use of a weapon, did not affect his defense, therefore it did not violate his due process rights. *See, Johnson v. Goord*, 305 Fed.Appx. 815, 2009 WL 57030 at * 1 ("Although the version of the misbehavior report introduced at the disciplinary hearing included a sentence missing from the version previously served on Johnson, the absent sentence did not affect Johnson's defense. The discrepancy between the two misbehavior reports therefore did not infringe Johnson's due process rights.").

## CONCLUSION

In opposing the misbehavior report, Plaintiff raised substantial questions as to X's veracity.   As Defendant admits, there was significant exculpatory evidence that supported Plaintiff's claim of innocence.   Nevertheless, Defendant found X's claim to credible, and it is not this Court's role to re-weigh the evidence. *See, Johnson v. Goord*, 305 Fed.Appx. 815, 2009 WL 57030 at * 1 ("Judicial review of the written findings required by due process is limited to determining whether the disposition is supported

by 'some evidence.'  This standard is extremely tolerant and is satisfied if there is any evidence in the record that supports the disciplinary ruling.") (citations and internal quotation marks omitted).  Defendant has established as a matter of law that he did not violate Plaintiff's procedural due process rights, and his motion for summary judgment [#8] is therefore granted.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.  The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated:       Rochester, New York
             April 30, 2013

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge